# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

MARTIN LEE BROOKS,

Plaintiff,

v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

Defendant.

_____/

Case No.  1:11-cv-2124-SKO

**ORDER ON PLAINTIFF'S COMPLAINT**

(Doc. No. 1)

## **INTRODUCTION**

Plaintiff Martin Lee Brooks ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application for Supplemental Security Income ("SSI") pursuant to Title XVI of the Social Security Act. 42 U.S.C. § 405(g).  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

---

[1]  The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 9, 10.)

# BACKGROUND

Plaintiff was born on July 30, 1956.   (Administrative Record ("AR") 28, 154, 222.) Plaintiff worked as a printer from 1978 to 1987, as a laborer in oilfield construction from 1989 to 1990, and as a doorman at a nightclub from January to October 1991.  (AR 189.)  Plaintiff stopped working in 1991 because of depression, anxiety, and back and neck problems.  (AR 182.)  On November 25, 2008, Plaintiff applied for SSI benefits, alleging his disability began in July 1992. (AR 182.)

## A.      Summary of Relevant Medical Evidence[2]

In April 1996, Plaintiff underwent a mental health evaluation at Kern County Substance Abuse, administered by Dirk O. Wales, M.D.  (AR 254-56.)  Plaintiff reported feeling down for several years prior to the examination, and that he had been self-medicating with drugs and had used "everything known to man."  (AR 254-55.)  His drug of choice was crank, but he had used cocaine, LSD, mushrooms, and marijuana.  (AR 255.)  He noted he had been chemical-free since 90 days prior to the examination, which was his longest period of sobriety in several years. (AR 255.)  He stated he was living with his mother and living on food stamps "and the generosity of his family."  (AR 254-55.)  He also indicated he had experienced suicidal thoughts in the past but not recently.  (AR 255.)

Dr. Wales diagnosed him with an adjustment disorder, dysthymia, and assigned a Global Assessment of Functioning ("GAF") score of 50.[3]  (AR 256.)  Dr. Wales prescribed Desyrel and

---

[2] Plaintiff does not challenge the ALJ's finding with respect to his physical limitations.  Further, the record contains evidence prior to November 25, 2008, the date on which Plaintiff filed his claim for SSI.  It appears that some of the evidence prior to 2008 was considered in conjunction with prior applications for disability.  (AR 314 (noting a prior denial in 1996 and a claim filing date of December 2005); AR 339 (same).)  However, neither the parties nor the ALJ's decision provide a discussion of any claims that were adjudicated prior to the one presently before the Court. The record indicates Plaintiff filed a claim in December 2005, which was finally denied in March 2007.  (AR 159.) Plaintiff was found not disabled.  (AR 159.)

[3] The GAF scale is a tool for "reporting the clinician's judgment of the individual's overall level of functioning."  Am. Psychiatric Ass'n, Diagnosis & Statistical Manual of Mental Disorders 32 (4th ed. 2000).  The clinician uses a scale of zero to 100 to consider "psychological, social, and occupational functioning on a hypothetical continuum of mental health- illness," not including impairments in functioning due to physical or environmental limitations.  *Id.* at 34.  A GAF score between 41 and 50 indicates serious symptoms or serious impairment in social, occupational, or school functioning.  *Id.*

advised Plaintiff to follow-up in four weeks.  (AR 256.)   His prognosis was listed as fair. (AR 256.)

On February 7 and 10, 2006, Plaintiff was referred to Michael G. Musacco, Ph.D., for psychological evaluation.  (AR 309-13.)   Psychological testing was administered, including a Minnesota Multiphasic Personality Inventory and a Personality Assessment Inventory.  (AR 311.) Plaintiff was diagnosed with amphetamine dependence, partial remission; cannabis abuse; dysthymia; anxiety disorder; panic disorder, without agoraphobia; and a personality disorder. (AR  312.)

Apparently in association with a prior claim, Plaintiff was sent to Kimball Hawkins, Ph.D., for a mental status examination on June 30, 2006.[4]  (AR 305-08.)   At the time of evaluation, Plaintiff was 49 years old and lived with his mother.  He had a driver's license, but his mother dropped him off for the assessment.

He attended Strathmore Union High School, taking regular classes, as opposed to special education classes, but he never graduated.  (AR 305.)   He reported a history of psychiatric treatment for behavioral issues as a child.

Dr. Hawkins reviewed the psychological evaluation administered by Dr. Musacco, and performed a mental status examination.  Dr. Hawkins indicated Plaintiff has a history of an anxiety disorder, and appeared to have some problems with self-defeating personality traits. (AR 307.)  He did not show substantial handicap in cognitive functioning.  Despite complaints of avoiding people and anxiety, he was not receiving ongoing psychiatric treatment.

Dr. Hawkins opined Plaintiff's ability to understand, remember, and carry out complex instructions was good; and his ability to understand, remember, and carry out simple instructions was unlimited.  He had adequate ability to maintain concentration, attention, and persistence; perform activities within a schedule and maintain regular attendance; complete a normal workday and workweek without interruptions from psychologically based symptoms, although he reported

---

[4] As discussed above, the record reflects Plaintiff filed a disability claim in December 2005 which was finally denied in March 2007.  It appears this evidence was already considered as part of the denial of the 2005 claim.  (AR 159.)

significant problems that were not observable; and would be able to respond appropriately to changes in the work setting.  (AR 308.)

On August 22, 2006, Barry Rudnick, M.D., reviewed Plaintiff's records from October 15, 2003, through August 22, 2006, and completed a Psychiatric Review Technique form as well as a Mental Residual Functional Capacity Assessment form.  (AR 320-37.)  He found Plaintiff to be mildly limited in his activities of daily living and in maintaining concentration, persistence, or pace.  He opined Plaintiff was moderately limited in maintaining social functioning; interacting appropriately with the general public, and accepting instructions and responding appropriately to criticism from supervisors.  (AR 330-36.)  In all other functional abilities, he found Plaintiff not significantly limited.  (AR 335-37.)

On March 13, 2007, state-agency non-examining doctor R. Starace, Ph.D, rendered an opinion for purposes of a "reconsideration determination" that Plaintiff could understand, remember, and execute instructions; sustain concentration, pace, and persistence; and socially interact adequately and adapt to change.  (AR 342.)

On March 10, 2008, a Kern County Mental Health progress note from Richard Feldman, M.D., indicated he believed Plaintiff's current disability was mild, and that Plaintiff would be able to perform part-time work.  (AR 623.)  Between May and July 2008, Plaintiff was incarcerated in Kern County Correctional Facility.  (AR 389-406.)  At the intake screening, Plaintiff reported he had been smoking methamphetamine and marijuana the prior night.  (AR 392.)  After Plaintiff's release in July 2008, he was placed on probation for five years and ordered to enter a sober living facility for one year.  (AR 259, 813.)

In October 2008, Plaintiff continued mental health treatment at Kern County Mental Health pursuant to court order.  (AR 809-14.)  He reported his mother had secured a donation to pay for his living arrangement through December 2008, but she could not pay after that time and it was noted that Plaintiff would be homeless again.  (AR 810.)  Marriage and Family Therapist Sylvia Petitt indicated Plaintiff could not work due to his depression and physical pain.  (AR 813.) On evaluation, the therapist noted Plaintiff's ability to concentrate was impaired, he was inattentive, he had poor immediate and long-term memory, and he demonstrated poor judgment

1  and insight.  (AR 816.)  Plaintiff's treatment goal was listed as reaching mental stability on

2  medication, obtaining stable housing, and achieving sobriety.  (AR 817.)

3      On December 4, 2008, Dr. Feldman completed a "psychiatric medication evaluation."

4  (AR 805-08.)  He indicated Plaintiff was initially evaluated on October 24, 2008, a diagnostic

5  impression of Depressive Disorder, not otherwise specified and polysubstance dependence was

6  made, and Plaintiff had been assigned a GAF score of 50 at that time.  (AR 805.)  Upon

7  examination, Dr. Feldman noted Plaintiff had clear speech, his mood was subdued, but his affect

8  range was full.  (AR 807.)  Plaintiff presented his dilemma without delusional elaboration, but he

9  suffered infrequent, brief auditory hallucinations, which did not appear problematic.  (AR 807.)

10 His judgment was noted to be fair but could deteriorate under stress; Plaintiff's insight was

11 "present" and his impulse control was noted to be fair.  (AR 807.)  Dr. Feldman diagnosed

12 depressive disorder, not otherwise specified, and noted a need to rule out dysthymic disorder.  He

13 assigned Plaintiff a GAF score of 48.  (AR 808.)

14      Plaintiff continued treatment with Dr. Feldman at Kern County Mental Health from 2008

15 to 2010.  His treatment included group and individual counseling, as well as oversight by Dr.

16 Feldman for medication management.  (AR 588-821.)  During the course of his treatment, he

17 occasionally stopped taking his medication and underwent medication adjustments to address his

18 trouble sleeping.  He participated in group therapy and it was noted that other group members

19 appeared to "look up to [Plaintiff] as he is quite knowledgeable and appears to be like a father

20 figure to others."  (AR 769.)

21      On January 21, 2009, K. Loomis, M.D., a state-agency non-examining physician, reviewed

22 Plaintiff's medical records and opined on his functional abilities.  (AR 407-20.)  Dr. Loomis found

23 Plaintiff only mildly limited in his activities of daily living and in maintaining social functioning,

24 but found Plaintiff moderately limited in his ability to maintain concentration, persistence, or pace;

25 and in his ability to understand, remember, and carry out detailed instructions.  (AR 415.)   Dr.

26 Loomis found Plaintiff not significantly limited in any other area of functioning.  (AR 418-20.)

27 Dr. Loomis concluded Plaintiff was capable of understanding, remembering, and carrying out

28 simple one- to two-step tasks; maintaining concentration, persistence, and pace throughout a

1  normal workday; interacting adequately with coworkers and supervisors without difficulty;
2  dealing with the demands of the general public; and making adjustments and avoiding hazards in
3  the workplace.  (AR 420.)

4      A May 2009 Kern County Mental Health progress note indicates Plaintiff had passed the
5  General Educational Development Test ("GED") to obtain a high-school diploma equivalent, had
6  been "clean" for 13 months, was leading group-therapy sessions, and had participated in many
7  mental health services, demonstrating "motivation to improve and change."  (AR 777.)

8      On June 11, 2009, a progress note signed by Dr. Feldman assessed Plaintiff's current
9  disability as mild, but indicated Plaintiff was not able to work.  (AR 791.)  His prognosis was
10  marked as "fair."  (AR 791.)  On June 25, 2009, Dr. Feldman completed another progress note
11  indicating that Plaintiff's current disability was moderate, he was unable to work, and his
12  prognosis was considered fair.  (AR 776.)

13      On July 4, 2009, Helen C. Patterson, Ph.D., a state-agency non-examining physician,
14  reviewed Plaintiff's medical records and completed a Psychiatric Review Technique form and a
15  Mental Residual Functional Capacity Assessment form.  (AR 484-502.)  Dr. Patterson determined
16  Plaintiff was moderately limited in his ability to understand, remember, and carry out detailed
17  instructions; work in coordination with or proximity to others without being distracted by them;
18  complete a normal workday and workweek without interruptions from psychologically-based
19  symptoms; perform at a consistent pace without an unreasonable number and length of rest
20  periods; accept instructions and respond appropriately to criticism from supervisors; and get along
21  with coworkers or peers without distracting them or exhibiting behavioral extremes.  (AR 499.)
22  Dr. Patterson also found Plaintiff markedly limited in his ability to interact appropriately with the
23  general public.

24      In sum, Dr. Patterson concluded the preponderance of evidence indicated Plaintiff is
25  capable of understanding and remembering at least simple instructions and can effectively perform
26  routine tasks; sustaining a normal workday and workweek, despite occasional interruption from
27  mood-disorder symptoms and maladaptive personality traits; maintaining appropriate social
28  interaction with supervisors and co-workers, but may have difficulty handling a job requiring

close interaction with the public; and adapting to normal changes within a work environment. (AR 501.)

On August 6, 2009, Dr. Feldman again completed a progress report assessing Plaintiff's current disability as mild, finding Plaintiff unable to work, and noting his prognosis remained "fair." (AR 747.) On September 16, 2009, a similar progress note was entered by Dr. Feldman. (AR 722.) On September 28, 2009, a progress note indicated a discussion regarding sending Plaintiff to a job developer, which Plaintiff "thought . . . to be a good idea." (AR 712.) Plaintiff was encouraged to see the job developer and "not depend [on] getting SSI because nothing is a guarantee." (AR 712.)

Progress notes and counseling records in November and December 2009 indicate Plaintiff was volunteering at Goodwill Industries two days a week, as well as volunteering two days a week at the Salvation Army. (AR 665-66.) In January 2010, Plaintiff reported he was continuing to volunteer at Good Will, and stated he was "trying to get hired on fulltime." (AR 652.) He was also able to pay his rent at Griffen's Gate, a transitional living facility, by performing "work for them" and the General Assistance Program was paying for his food.[5] (AR 652.) In February 2010, Plaintiff reported continuing his volunteer work at Good Will and he reported a desire to be hired there for pay. (AR 643.) In May 2010, Plaintiff was reminded that his mental health case would be closed with Kern County at the end of June, and Plaintiff reported he was hoping to get a job in Tehachapi helping an elderly man who needed companionship, which was why he was trying to get his driver's license back. (AR 595.) He also indicated he wanted to move back to Washington. (AR 595.)

Plaintiff was seen by Dr. Feldman on June 2, 2010, who noted Plaintiff was leaving the program. Dr. Feldman indicated Plaintiff had been sober for two years, and was planning to move to Tehachapi if he could get a job there. (AR 594.) His current disability was listed as "mild," and his prognosis was listed as "good." (AR 594.) Plaintiff still had auditory hallucinations, but his thought process was unremarkable, and his insight, memory, and judgment were noted to be

---

[5] Each county in California maintains a General Assistance or General Relief Program designed to provide relief and support to indigent adults who are not supported by their own means. *See generally http://www.cdss.ca.gov/cdssweb/PG132.htm.*

1  "good." (AR 593.)  His concentration and attention were also intact. (AR 593.)  Plaintiff was seen

2  for a final visit at Kern County Mental Health on June 8, 2010, and he was noted to be in a good

3  mood and ready to move on in his life. (AR 588.)

4      On October 25, 2010, Robyn Field, Ph.D., completed a mental function capacity

5  questionnaire.  Dr. Field diagnosed Plaintiff with Bipolar I Disorder, most recent episode mixed,

6  severe with psychotic features. (AR 823.)  Dr. Field also noted chronic back pain and peripheral

7  neuropathy. (AR 823.)  Dr. Field found Plaintiff had no discernable improvement in response to

8  treatment, and he was assigned a current GAF score of 50. (AR 823.)  Plaintiff's prognosis was

9  said to be very poor for sustained employment, but fair prognosis overall if he "stayed clean," and

10  that he was compliant with his medication regime. (AR 824.)  Dr. Field noted Plaintiff's problems

11  started in school, which was "probably ADHD," but it was never diagnosed, and he had

12  experienced many concussions with losses of consciousness due to accidents and fights.  "That

13  combined with years of substance abuse, has left him cognitively impaired." (AR 824.)

14      Dr. Field completed a form indicating Plaintiff's mental abilities and aptitudes for unskilled

15  work. (AR 826.)  Dr. Field opined Plaintiff was either unable to meet competitive standards or

16  had no useful ability to function in the following areas: (1) maintain attention for two-hour

17  segments; (2) maintain regular attendance and be punctual within customary usually strict

18  tolerances; (3) sustain an ordinary routine without special supervision; (4) work in coordination

19  with or proximity to others without being unduly distracted; (5) make simple work-related

20  decisions; (6) complete a normal workday and workweek without interruptions from

21  psychologically based symptoms; (7) perform at a consistent pace without an unreasonable

22  number and length of rest periods; (8) accept instructions and respond appropriately to criticism

23  from supervisors; (9) get along with co-workers or peers without unduly distracting them or

24  exhibiting behavioral extremes; (10) deal with normal work stress; and (11) maintain awareness of

25  normal hazards and take appropriate precautions. (AR 826.)

26      Dr. Field further opined that, as to Plaintiff's ability to perform skilled work, he would be

27  unable to meet competitive standards or would have no useful ability to function in the following

28  areas:  (1) understanding, remembering, and carrying out detailed instructions; (2) setting realistic

goals or make plans independently of others; and (3) dealing with stress of semiskilled and skilled work.  (AR 827.)  Dr. Field further opined that Plaintiff was unable to meet competitive standards in his ability to interact appropriately with the general public; maintain socially appropriate behavior; adhere to basic standards of neatness and cleanliness; and travel in unfamiliar places. (AR 827.)  Dr. Field indicated Plaintiff's impairments or treatment would cause him to be absent from work more than four days per month.  (AR 828.)  Dr. Field reported that, at age 54, "Marty has never had a period of successful functioning, occupationally or socially.  It is doubtful he will become capable at this point."  (AR 828.)

**B.       Administrative Proceedings and Lay Testimony**

The Commissioner denied Plaintiff's application initially and again on reconsideration; consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 98-153.)  On September 28, 2010, the ALJ held a hearing.  Plaintiff testified, through the assistance of counsel, and a Vocational Expert ("VE") testified.  (AR 35-75.)

**1.       The VE Hearing Testimony**

At the hearing, the ALJ asked the VE to consider a hypothetical individual of the same age, education, and work background as Plaintiff who could lift and carry 50 pounds occasionally, 25 pounds frequently; sit, stand, or walk six hours in an eight-hour day; and who is restricted to simple, routine tasks with occasional public contact.  (AR 68.)  The VE testified that the "full world of sedentary, light, medium, unskilled work" would be available, but with limited public contact that number would be significantly reduced because it eliminates jobs like cashiers and sales people.  However, such a hypothetical person would retain the ability to perform jobs such as packager, extractor operator, or machine packager.  (AR 68-69.)

The ALJ also asked the VE to consider a hypothetical person of the same age, education, and with the same work background as Plaintiff who retained the ability to lift 20 pounds occasionally and 10 pounds frequently; sit, stand, and walk six hours in an eight-hour day; but is limited to occasional stooping, crouching, crawling, kneeling, climbing, and reaching overhead bilaterally; and is further limited to simple, routine tasks with only occasional public contact. (AR 69.)  The VE testified that such a person would be able to perform all light level and

sedentary unskilled work, but with a limitation to only occasional public contact, two-thirds of the one million plus jobs would disappear, which would place the estimated job numbers at 333,000 available.   The jobs available would include, for example, linen supply load builder, garment sorter, and a router.  (AR 69-70.)

The ALJ posed a third hypothetical, asking the VE to consider the same limitations as in the second hypothetical, but with a "sit/stand option."  The VE testified that such a hypothetical person could perform the same jobs identified in response to the second hypothetical, but those numbers would be reduced by two-thirds.  (AR 70.)

The VE posed a fourth hypothetical that was the same as the second and third, but with the added limitation that the person would need an additional two to four 30-minute breaks per day. (AR 70.)  The VE testified there would be no work such a hypothetical person could perform. (AR 70.)

Plaintiff's counsel, Mr. Orin, also posed hypotheticals for the VE to consider.  Mr. Orin asked the VE to consider a person with the same limitations as in the first hypothetical posed by the ALJ, but who also had moderate limitations in the ability to carry out detailed instructions, work in coordination or proximity to others without being distracted, complete a normal workday and work week without interruptions from psychological symptoms, and perform at a consistent pace without an unreasonable number or length of rest periods.  (AR 72.)  Mr. Orin also included a marked limitation in the ability to interact with the general public, and moderate limitation in the ability to (1) accept instructions and respond appropriately to criticism from supervisors, and (2) get along with coworkers or peers without distraction.  (AR 72.)

The VE testified that moderate symptoms would affect the ability to work, but would not preclude it.  However, if it were assumed that moderate limitations would affect the individual one-third of the day, then moderate limitations in the ability to work with others and complete a workday, as well as issues with pace, would foreclose the world of work.  (AR 73.)

1          **2.    The ALJ's Decision**

2          On December 8, 2010, the ALJ found Plaintiff not disabled.  (AR 21-29.)   The ALJ

3    determined Plaintiff retained the residual functional capacity ("RFC")[6] to lift and/or carry 20

4    pounds occasionally and 10 pounds frequently; sit, stand, and/or walk six hours in an eight-hour

5    workday; occasionally stoop, crouch, crawl, climb, kneel, and reach overhead; and perform

6    simple, routine tasks with occasional public contact.  (AR 24.)

7          Specifically, the ALJ found that Plaintiff (1) had not engaged in substantial gainful activity

8    since November 25, 2008, the date of his application; (2) has the following severe impairments:

9    lumbar degenerative joint disease, chondromalacia of the knees, cervical degenerative joint

10   disease, right shoulder degenerative joint disease, major depression with psychotic features, and a

11   history of polysubstance abuse; (3) does not have an impairment or combination of impairments

12   that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P,

13   Appendix 1; (4) has no past relevant work; but (5) has the ability to perform work that exists in

14   significant numbers in the national economy.  (AR 21-29.)

15                              **SCOPE OF REVIEW**

16         The ALJ's decision denying benefits "will be disturbed only if that decision is not

17   supported by substantial evidence or it is based upon legal error."  *Tidwell v. Apfel*, 161 F.3d 599,

18   601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its

19   judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).

20   Instead, the Court must determine whether the Commissioner applied the proper legal standards

21   and whether substantial evidence exists in the record to support the Commissioner's findings.  *See*

22   *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).  "Substantial evidence is more than a mere

23   scintilla but less than a preponderance."  *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th

24   Cir. 2008).  "Substantial evidence" means "such relevant evidence as a reasonable mind might

25   _____

26   [6] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule.  Social Security Ruling 96-8p.[1]  The RFC assessment considers only functional limitations and restrictions that result from an

27   individual's medically determinable impairment or combination of impairments.  *Id.*  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, *inter alia*, medical records, lay evidence, and

28   'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).   The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

## APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).   The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy.   42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability.   In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity.   20 C.F.R. §§ 404.1520(b), 416.920(b).   If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities.   *Id*. §§ 404.1520(c), 416.920(c).   If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1.   *Id*. §§ 404.1520(d), 416.920(d).   If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various

1  limitations to perform her past work.  *Id.* §§ 404.1520(f), 416.920(f).  If not, in Step Five, the

2  burden shifts to the Commissioner to show that the claimant can perform other work that exists in

3  significant numbers in the national economy.  *Id.* §§ 404.1520(g), 416.920(g).  If a claimant is

4  found to be disabled or not disabled at any step in the sequence, there is no need to consider

5  subsequent steps.  *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§

6  404.1520, 416.920.

7  **DISCUSSION**

8  **A.      ALJ's Consideration of the Medical Evidence**

9  **1.      Dr. Feldman's Opinion**

10  Plaintiff contends the ALJ failed to discuss Dr. Feldman's numerous opinions and

11  treatment notes that paint the longitudinal picture showing Plaintiff was unable to work for "well

12  over the 12-month durational requirement."  (Doc. 22, 12:1-3.)

13  The Commissioner contends that, while not referring to Dr. Feldman by name in the

14  decision, the ALJ expressly considered the treatment notes from Kern County Mental Health

15  where Dr. Feldman was a staff psychologist; this consideration necessarily included review of Dr.

16  Feldman's treating records.  The ALJ also discussed Dr. Feldman's initial examination report.

17  According to Defendant, Dr. Feldman never indicated Plaintiff could not work and when Dr.

18  Feldman last saw Plaintiff in June 2010, his prognosis was considered "good" and his symptoms

19  were noted to be only "mild."  (AR 594.)

20  The Kern County Mental Health Medication Progress Notes form, which Dr. Feldman

21  completed each time he saw Plaintiff, includes a table prompting the treating provider to check

22  boxes indicating the patient's current level of disability, the expected length of treatment, the

23  prognosis, and the patient's ability to work.  In the section prompting a response regarding the

24  patient's ability to work, there are five boxes that may be checked:  "N/A," "No," "With Support,"

25  "Part-Time," and "Full-Time."  (AR 468.)  Progress notes were completed monthly by Dr.

26  Feldman over the course of Plaintiff's two years of treatment.  Sometimes the monthly progress

27  note marked Plaintiff as unable to work (AR 449 (progress note of May 14, 2009), 469 (progress

28  note of February 4, 2009), 477 (progress note of January 7, 2009), 722 (progress note of

1    September 16, 2009)), other progress notes indicated Plaintiff could work "Part-time" (*see, e.g.,*

2    AR 602 (progress note of May 5, 2010), 623 (progress note of March 10, 2010), 636 (progress

3    note of February 10, 2010))," and still other progress notes were left blank with regard to

4    Plaintiff's ability to work (*see, e.g.,* AR 440 (progress note of June 3, 2009), 452 (progress note of

5    May 8, 2009), 468 (progress note of March 4, 2009)).

6          The ALJ did not expressly reference Dr. Feldman or discuss the portion of certain progress

7    notes where it was marked that Plaintiff was unable to work.[7]  Nevertheless, the ALJ *did* discuss

8    the Kern County Mental Health treatment records that necessarily contained Dr. Feldman's

9    progress notes regarding Plaintiff's condition.   Citing Dr. Feldman's progress notes, the ALJ

10   discussed that Plaintiff was diagnosed with a depressive disorder, not otherwise specified;

11   dysthymic disorder was to be ruled out; chronic early onset poly substance dependence; and a

12   personality disorder.  In substance, the ALJ found that, although these records reflected Plaintiff's

13   mental condition "waxed and waned, his condition was essentially stable on medications."  (AR 25

14   (citing AR 588-821).)  Plaintiff had participated in regular counseling, he was noted to have made

15   a lot of progress during his counseling, he had asked for assistance finding a volunteer job, and in

16   January 2010, Plaintiff told his counselor he was hoping to be hired full-time at his volunteer

17   work.  (AR 25.)

18         The ALJ's failure to expressly discuss Dr. Feldman's opinion regarding Plaintiff's ability to

19   work was not error.   First, the ALJ's decision reflects consideration of Dr. Feldman's treating

20   notes, even though his name is not expressly referenced.  *Magallanes v. Bowen*, 881 F.2d 747, 755

21   (9th Cir. 1989) (The court is "not deprived of [its] faculties for drawing specific and legitimate

22   inferences from the ALJ's opinion.").   Second, the notation in check-box form that Plaintiff was

23   unable to work is not a medical opinion, and is therefore not entitled to be considered as such.

24   20 C.F.R. § 416.927(e); *see also Tonapetyan v. Halter*, 242 F.3d 1144 1148-49 (9th Cir. 2001)

25   (ALJ not bound by opinion of treating physician with respect to the ultimate disability

26   determination); *Martinez v. Astrue*, 261 Fed. App'x 33, 35 (9th Cir. 2007) ("[T]he opinion that [the

27

28   _____
     [7] The Commissioner is incorrect that Dr. Feldman never found Plaintiff unable to work.

14

claimant] is unable to work" is not a medical opinion . . . [and] is therefore not accorded the weight of a medical opinion.").

Further, although Plaintiff contends the ALJ was incorrect in concluding the Kern County Mental Health records showed minimal symptoms and improvement with medication, the ALJ's interpretation of these medical records, when viewed as a whole, is reasonable and must be upheld.  By 2010, Plaintiff's symptomatology was repeatedly and consistently marked as "mild" by Dr. Feldman.  (AR 594 (June 2010), 602 (May 2010), 611 (April 2010) 623 (March 2010), 636 (February 2010), 648 (January 2010).)  Plaintiff was noted to have made progress in therapy, had engaged in volunteer work, and expressed a desire for full-time employment (*e.g.,* AR 602). Moreover, the progress notes indicating Plaintiff could not work are internally inconsistent with other portions of the notes indicating Plaintiff's current disability was "mild" and his prognosis "good" or "fair," and there is no discussion as to how or why Plaintiff's impairments prevented him from working.  (*See, e.g.,* AR 611, 648.)   In sum, the ALJ did not err in failing to expressly reference Dr. Feldman's name in the decision, or in failing to discuss the check-boxes in various progress notes indicating Plaintiff was unable to work.

### 2.    Dr. Field's Opinion

Plaintiff contends the ALJ erred in rejecting Dr. Field's opinion. The ALJ gave several reasons for assigning little weight to the opinion of Dr. Field:

> The claimant's treating psychologist, Dr. Field, submitted a Medical Source Statement dated October 25, 2010, indicating that the claimant has listing level mental limitations and was not employable (Exhibit 26F).  This opinion is given little weight.  Dr. Field only saw the claimant on 3 occasions (Exhibit 26F, p. 1). Additionally, her findings are inconsistent with the claimant's extensive counseling records discussed above, which show minimal symptoms and improvement with medications, the more persuasive opinion of consultative examiner Dr. Hawkins, above, issued after thorough psychological testing, and the fact that the claimant was working part-time and attempting to get hired full-time.  Additionally, during the period in question the claimant was able to obtain his GED and reported that he attends NA or AA meetings five times a week with a friend, indication of an ability to concentrate and maintain regular attendance . . . The opinion of treating physician Dr. Field is given little weight for the reasons discussed above.

(AR 26.)  Plaintiff maintains that none of these reasons constitutes a specific and legitimate basis to disregard Dr. Field's opinion.

**a.      The Number of Times Plaintiff Saw Dr. Field**

Plaintiff contends the fact that he saw Dr. Field only three times was not a legally sufficient basis for the ALJ to reject Dr. Field's opinion.  The Commissioner responds that, when considering the weight to give to treating physicians' opinions, the longer a treating physician has seen the claimant, the more weight is afforded to that physician's opinion.  (Doc. 23, 12:9-19.)

Pursuant to 20 C.F.R. § 416.927(d), the treating physician's opinion is given controlling weight when the opinion is "well-supported by medical acceptable clinical and laboratory diagnostic techniques and it is not inconsistent with other substantial evidence in the record."  This is so because generally treating physicians are employed to cure and therefore have a greater opportunity to know and observe the claimant.  *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007). Despite the presumption of special weight afforded to treating physicians' opinions, the ALJ is not bound to accept the opinion of a treating physician.  However, the ALJ may only assign less weight to a treating physician's opinion, when contradicted by another physician, if the ALJ provides specific and legitimate reasons for discounting that opinion.  *See Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995).  A treating physician's opinion should be afforded great weight so long as the physician has seen the claimant "a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment."  20 C.F.R. §§ 416.927(d)(2)(i).

In the context of the ALJ's discussion of the evidence, the fact that Dr. Field only saw Plaintiff three times was relevant in determining whether his opinion should be given more weight than the two years of treating records from Kern County Mental Health.  The ALJ expressly noted the Kern County Mental Health records, reflecting two years of treatment immediately prior to Dr. Field's opinion that showed only minimal symptoms and improvement with medications. (AR 26.)  Thus, Dr. Field's treating opinion was given less weight in the face of what the ALJ interpreted to be contradictory treatment records, showing greater functioning than that opined to by Dr. Field.  When comparing treating physicians, the length of time a physician treated the claimant is relevant to assigning weight to the opinion or clinical findings. 20 C.F.R. § 416.927(c)(6) (in assigning weight, the ALJ considers other factors, including "the extent to which an acceptable medical source is familiar with the other information in your case record").

1   Here, Dr. Feldman's records from Kern County denoted treatment spanning a far longer period

2   than Dr. Field's treatment of Plaintiff, and the ALJ found the Dr. Feldman's treatment notes as well

3   as the numerous counseling records from Kern County Mental Health offered a better picture of

4   Plaintiff's longitudinal condition than the opinion of Dr. Field after more limited treatment.  In this

5   context, the fact that Dr. Field treated Plaintiff only 3 times was an appropriate consideration.

6   Moreover, the Ninth Circuit's decision in *Ghokassian v. Shalala*, 41 F.3d 1300, 1303 (9th Cir.

7   1994), cited by Plaintiff in support of his argument, is distinguishable from this case.

8        In *Ghokassian*, the appellate court found a physician was entitled to treating-physician

9   status after examining the claimant twice in a 14-month period.  Importantly, the court also noted

10  that the treating physician at issue was the doctor with the most extensive contact with the

11  claimant.  *Id.* The Court concluded that the two reasons offered by the ALJ for rejecting the

12  opinion of the treating physician were insufficient.

13       Here, there is no dispute that Dr. Field is a treating physician; however, even the

14  contradicted opinion of a treating physician may be assigned less weight if the ALJ states specific

15  and legitimate reasons for doing so.  The ALJ was entitled to give more weight to the extensive

16  treatment and counseling records from Kern County Mental Health spanning two years than to Dr.

17  Field's opinion based which was based on two counseling sessions and one evaluation.

18       **b.    Plaintiff's Other Activities**

19       Plaintiff contends that his ability to attend support groups regularly, perform significant

20  volunteer work activities, and complete his GED, does not constitute a legally sufficient basis to

21  disregard Dr. Field's opinion.  Rather, he argues attending support groups five times per week "is a

22  testament to the difficulty in achieving and maintain sobriety, not the flowering of a personality."

23  (Doc. 22, 15:16-17.)  Additionally, Plaintiff contends that, although the ALJ found he retained the

24  ability to concentrate and maintain regular attendance based on his support group attendance, this

25  was not a basis to disregard Dr. Field's other assessments of Plaintiff's limitations including his

26  inability to get along with others, lack of self-control, limited ability to learn and follow through,

27  poor concentration, and auditory hallucinations.  Plaintiff also contends that, although he obtained

28  his GED, the treatment records establish he still has a self-critical nature and a negative outlook.

1    In sum, Plaintiff contends that he continued to have mental problems, which the ALJ failed to

2    acknowledge, despite Plaintiff's ability to participate in other activities.

3        Plaintiff is essentially offering a different interpretation of the evidence from that of the

4    ALJ.  Plaintiff asserts the record is susceptible to an interpretation that, despite his ability to

5    maintain *some* activities such as attending support grounds on a routine basis, volunteering

6    regularly, and completing a GED, he remained quite limited.  Although Plaintiff's interpretation of

7    the evidence is plausible, the ALJ's finding that Plaintiff's ability to undertake volunteer hours,

8    complete his GED, and participate regularly in support groups demonstrated a higher level of

9    functioning than that opined to by Dr. Field is also reasonable, and a proper basis to reject Dr.

10   Field's opinion.  *Morgan v. Comm'r Soc. Sec. Admin.*, 169 F.3d 595, 602-03 (9th Cir. 1999) (a

11   medical report's inconsistency with the overall record constitutes a legitimate reason for

12   discounting the opinion).  In *Velasquez v. Astrue*, the treating physician determined that the

13   claimant was extremely limited in almost all aspects of function, but the claimant was able to

14   perform volunteer work, attend school part-time, attend classes, and complete his homework.  The

15   court concluded the ALJ's rejection of the treating physician's opinion was supported by the extent

16   of the claimant's demonstrated abilities and activities.  No. 2011 WL 2633725, at * 7-8 (C.D. Cal.

17   July 5, 2011) ("Accordingly, the extreme and marked limitations expressed in Dr. Mejia's check-

18   off report are not consistent with the types of activities that plaintiff himself claims he can

19   perform.").

20       Plaintiff was functioning well with therapy and medication, his symptoms and disability

21   were noted by Dr. Feldman to be "mild" throughout his treatment in 2010 at Kern County Mental

22   Health (AR 594, 602, 611, 623, 636, 648) he attended support groups five nights a week (AR 42),

23   he expressed a desire for full-time work during the last months of his treatment (*e.g.,* AR 602, 643,

24   652), he reported working significant volunteer hours (AR 665-66), and he demonstrated the

25   concentration and persistence to complete a GED at the Bakersfield Adult School.  This is

26   substantial evidence to support the ALJ's finding that Plaintiff's activities, to which Plaintiff

27   testified and as noted in his medical records, reflected that he was less limited than opined to by

28   Dr. Field.  Because the ALJ's interpretation of Plaintiff's abilities based on activities such as

1   attendance at support groups, volunteering, and completing a GED is reasonable, it constituted a

2   legally sufficient basis to reject Dr. Field's opinion.  *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir.

3   1984).

4          **c.      Reliance on Dr. Hawkins' Opinion**

5          Plaintiff asserts he filed his application for SSI on December 5, 2008, and Dr. Hawkins'

6   opinion, rendered on June 30, 2006, is irrelevant to Plaintiff's condition in 2008 and the disability

7   period at issue here.   (Doc. 22, 13:5-9.)   Plaintiff also argues Dr. Hawkins' conclusions that

8   Plaintiff had unlimited or good function does not flow from Dr. Hawkins' notation that Plaintiff

9   engaged in self-defeating behaviors, nor does it square with Dr. Musacco's opinion that Plaintiff

10  had inadequate coping skills and functioned in social isolation.  (Doc. 22, 16-18.)

11         Defendant contends that Dr. Hawkins' 2006 opinion is relevant evidence and properly

12  considered by the ALJ because Plaintiff claimed he became disabled in 1992.  (Doc. 23, 15:9-21.)

13         "Medical opinions that predate the alleged onset of disability are of little relevance."

14  *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008).  Further, medical

15  evidence associated with a prior, already-adjudicated disability period is irrelevant to establish a

16  current disability, although it may be relevant to establish a condition worsened since it was

17  considered in a prior decision.  *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989).

18         Here, Dr. Hawkins' 2006 compensation examination report was apparently considered as

19  part of a prior claim, but there is no information offered by the parties or discussed by the ALJ that

20  addresses the prior claims.[8]  The same is true of the opinions of Drs. Musacco (AR 309-13), Dr.

21  Rudnick (AR 320-37), and Dr. Starace (AR 342) which were also rendered prior to 2008 and

22  perhaps considered as part of a prior claim.  Notwithstanding the status of Plaintiff's prior claim or

23  claims, the medical evidence prior to November 2008, including the opinion of Dr. Hawkins, is

24  relevant to the extent it sheds light on Plaintiff's longitudinal condition, treatment, and the severity

25  of his condition over time.  In general, the ALJ did not err by considering these opinions simply

26  because they were rendered prior to the date on which Plaintiff applied for SSI.

27

28  _____

[8] (*See* AR 159.)

1    Yet, the medical evidence prior to November 2008 is not, by itself, probative of Plaintiff's

2   level of disability in November 2008 and beyond, the relevant period for purposes of Plaintiff's

3   current application for SSI.[9]  *See Dotson v. Astrue*, No. 10-cv-00243-SKO, 2011 WL 1883468, at

4   * (E.D. Cal. May 17, 2011) (noting that an opinion rendered almost a year before the filing of

5   plaintiff's SSI application was "stale and not time-relevant to [p]laintiff's current claim of

6   disability," especially as compared to another opinion rendered one month after the application

7   was filed); *see also, Jesus v. Astrue*, No. EDCV 07-1247-MAN, 2009 WL 2900290, at * 7 n. 6

8   (C.D. Cal. Sept. 3, 2009) (GAF scores predating current SSI application filing date by a year and a

9   half not relevant to prove requisite changed circumstances to overcome presumption of continuing

10  non-disability).  Thus, standing alone, Dr. Hawkins' 2006 opinion does not constitute a specific

11  and legitimate basis for the ALJ to reject Dr. Field's 2010 opinion with respect to whether Plaintiff

12  was disabled at any time since November 25, 2008.

13   In sum, the ALJ's reliance on Dr. Hawkins' 2006 opinion as a basis to assign less weight to

14  the 2010 opinion of treating physician, Dr. Field, was error.  However, the ALJ provided other

15  legally sufficient grounds to reject Dr. Field's opinion, as discussed above.  Therefore, any error in

16  this regard was harmless.  *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (An error is

17  harmless if there remains substantial evidence support the ALJ's decision and the error does not

18  affect the ultimate nondisability determination).

19  **3.    Opinions of State Agency Non-Examining Physicians**

20   Plaintiff contends that, although the ALJ credited the opinions of state agency physicians

21  Dr. Loomis and Dr. Patterson, not all the limitations to which they opined were included by the

22  ALJ in Plaintiff's RFC.  First, Dr. Loomis opined Plaintiff could understand, remember, and carry

23  out simple one- to two-step tasks, but a limitation to one- to two-step tasks was not included in the

24  RFC.  Second, Dr. Patterson found that Plaintiff would suffer from occasional interruption of a

25  _____

26  [9] An SSI claimant may be found to meet the requirements of the Act prior to the date on which his or her SSI application was filed, but the Agency cannot pay the claimant for any month prior to the date on which the application was filed.  20 C.F.R. § 416.335.  Even assuming that the evidence prior to November 2008 was relevant to

27  determining whether Plaintiff was disabled at that time, it does not necessarily establish Plaintiff was disabled on or after November 2008.  Moreover, to the extent this evidence was considered in conjunction with a prior claim, which

28  it appears it was, it would *only* be relevant to determining whether Plaintiff's condition had worsened since the denial of his prior claim.  *Fair*, *supra*.

1   normal work schedule due to his mood disorder and maladaptive personality, but this was not

2   presented to the VE as a limitation.  Plaintiff contends there is, therefore, no way to know whether

3   this limitation would impact Plaintiff's ability to work.

4       Defendant asserts Plaintiff's argument in this regard is an attempt to "parse the words used

5   in these opinions" and then offer his own interpretation of those opinions.  (Doc. 23, 11:22-25.)

6   Defendant contends that all the physicians, with subtle differences in wording, consistently

7   indicated Plaintiff could perform at least simple work involving occasional public contact.  For

8   example, although Dr. Patterson stated Plaintiff would suffer from occasional interruption of a

9   normal work schedule, he also concluded Plaintiff was able to sustain a normal workday and

10   workweek, despite his mental condition.  Defendant argues the ALJ was entitled to consider the

11   entire record and assess Plaintiff's RFC based on his interpretation of the evidence.

12       **a.   Dr. Loomis' Opinion**

13       As it pertains to Dr. Loomis' opinion that Plaintiff "is capable of understanding,

14   remembering and carrying out simple one to two step tasks," this is not phrased as a limitation but

15   as an affirmative statement of what Plaintiff *can* do.  (AR 420.)  The RFC, on the other hand, is

16   formulated to describe the *most* a claimant can do.  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1)

17   (RFC is "the most [one] can still do despite [his or her] limitations" and represents an assessment

18   "based on all the relevant evidence.").

19       A similar argument was presented to the court in *Wilson v. Astrue* where the plaintiff

20   asserted a statement by a physician, Dr. Yang, that the plaintiff was "able to follow 1- and 2-part

21   instructions" was a limitation that was not consistent with the ALJ's RFC assessment finding that

22   the plaintiff was limited to simple, repetitive tasks.  No. 09-cv-1765 SS, 2010 WL 3894679, at *9

23   (C.D. Cal. Oct. 1, 2010).  The court found the ALJ's RFC determination was consistent with the

24   doctor's overall opinion, which showed that Dr. Yang believed Plaintiff was *able* to follow one-

25   and two-part instructions, not that he was necessarily *limited* to following one- and two-part

26   instructions.  *Id.* at *9.  Dr. Yang noted that the plaintiff was cooperative, attentive, alert in all

27   spheres, able to perform simple calculations, spell words, and his memory was intact; he presented

28   no obsessions or delusions; his medication was effective; and he performed household chores,

1    shopped, cooked, managed money, drove and played video games.  *Id.*  The court concluded that

2    Dr. Yang's opinion, taken in its entirety, did not support Plaintiff's argument that he was limited to

3    only one- and two-part instructions.

4            Here, as in *Wilson*, Dr. Loomis did not affirmatively limit Plaintiff to one- to two-step

5    tasks.  Rather, he stated that Plaintiff was *able* to complete such tasks, but was moderately limited

6    in the ability to perform tasks involving detailed instructions. Thus, the limitation was directed to

7    *detailed* job instructions, and even as to detailed instructions, Dr. Loomis found Plaintiff only

8    "moderately" limited.   Considering Dr. Loomis' entire opinion, it is clear, as in *Wilson*, that he

9    believed Plaintiff was not necessarily *limited* to tasks with one or two steps.   For example, Dr.

10   Loomis marked that Plaintiff was not significantly limited in almost every area of functioning,

11   including his ability to complete a normal workday, make simple work-related decisions,

12   remember locations and work-like procedures, maintain attention for extended periods, perform

13   activities within a schedule, sustain an ordinary routine without supervision, and work in

14   coordination or in proximity to others.  (AR 418-20.)    Moreover, Dr. Patterson, another non-

15   examining physician whom the ALJ credited, concluded that Plaintiff was "capable of

16   understanding and remembering at least simple instructions and can effectively perform routine

17   tasks."  (AR 501.)

18           It is within the province of the ALJ to interpret the medical evidence and resolve any

19   ambiguities or inconsistencies that might exist. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir.

20   1995).  The ALJ was entitled to interpret Dr. Loomis' findings in the context of his complete

21   report, as well as Dr. Patterson's opinion, to formulate the RFC; the ALJ was not required to adopt

22   the exact language used by Dr. Loomis.

23           Plaintiff's mental RFC for simple, routine work has been found to be generally consistent

24   with the Dictionary of Occupational Titles ("DOT") job descriptions requiring a reasoning level of

25   2.  *Meissl v. Barnhart*, 403 F. Supp. 2d 981, 984 (C.D. Cal. 2005); *Hackett v. Barnhart*, 395 F.3d

26   1168, 1176 (10th Cri. 2005) (level two reasoning consistent with limitation to simple and

27   repetitive tasks); *Lara v. Astrue*, 305 F. App'x 324, 326 (9th Cir. 2008) (someone able to perform

28   simple, repetitive tasks is capable of work requiring rigor and sophistication beyond reasoning

1  level one). Here, the VE described three types of jobs Plaintiff could perform: linen supply load

2  builder, garment sorter, and router. These are all defined by the DOT as involving reasoning level

3  2. Accordingly, the ALJ's interpretation of Dr. Loomis' opinion and formulation of the RFC in

4  this regard was not erroneous.

5              **b.        Dr. Patterson's Opinion**

6         Although Dr. Patterson noted Plaintiff would suffer from "occasional interruption from

7  mood disorder symptoms and maladaptive personality traits," he also concluded Plaintiff remained

8  "capable of sustaining a normal workday and workweek." (AR 501.) Dr. Loomis opined Plaintiff

9  was not significantly limited in the ability to complete a normal workday or workweek without

10 interruptions from psychologically based symptoms. (AR 419.) The ALJ was entitled to interpret

11 these opinions as concluding Plaintiff was not significantly limited in the ability to complete a

12 normal workweek. The limitations presented to the VE need not include every limitation

13 presented by a physician, rather, only those limitations properly included in the RFC must be

14 presented to the VE. *See Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988) (hypothetical to the

15 VE must include all limitations in the RFC). Therefore, the ALJ did not include a limitation to

16 complete a normal workweek in the RFC, and it was not required to be presented to the VE.

17        Plaintiff also contends Dr. Patterson's conclusion that Plaintiff remains capable of

18 sustaining a normal workday and workweek despite interruptions from symptoms of his mood

19 disorder and maladaptive personality traits was not a medical opinion.[10] Rather, Dr. Patterson's

20 *medical* opinion is limited only to whether Plaintiff would suffer from these symptoms; according

21 to Plaintiff, it is for a VE to determine whether Plaintiff would remain able to complete a normal

22 workday or workweek without interruptions from his symptoms. Dr. Patterson's statement that

23 Plaintiff remained able to complete a normal workday or workweek is an attempt to quantify the

24 level of interruption from which he believed Plaintiff would suffer with "moderate" limitation.

25

26 [10] Despite Plaintiff's argument in this regard, Dr. Field provided opinions regarding whether Plaintiff would be able "to meet competitive standards" with regard to some of his functioning, including completing a normal workday and

27 workweek without interruptions from psychologically-based symptoms. (AR 826.) Plaintiff urges the Court to credit this as a medical opinion, yet argues Dr. Patterson's opinion as to interruption from psychologically based symptoms

28 is not a medical opinion that may be given any special weight.

(AR 500, 501.)  Such quantification comes within the scope of Dr. Patterson's medical opinion and professional judgment, and does not impinge on the role of the VE.

     **c.**     **Conclusion**

     In conjunction with the treating records from Kern County Mental Health from 2008 to 2010, the opinions of Drs. Loomis and Patterson constitute substantial evidence.  When considered in the context of the entire record, the ALJ was entitled to interpret these records and was not required to adopt particular or exact wording of the physicians in formulating the RFC.[11]

**CONCLUSION**

     Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence and is AFFIRMED.  The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security, and against Plaintiff Martin Lee Brooks.

IT IS SO ORDERED.

    Dated:   **March 25, 2014**                **/s/ Sheila K. Oberto**
                                             UNITED STATES MAGISTRATE JUDGE

---

[11] Dr. Hawkins' 2006 examination and opinion regarding Plaintiff's limitations, Dr. Musacco's evaluation of Plaintiff in 2006, and Dr. Starace's opinion in March 2007 were all relevant evidence for Drs. Loomis and Patterson to consider for purposes of assessing Plaintiff's condition over time and comparing it to more current treating records, even to the extent that medical evidence was considered as part of a prior claim.  As interpreted by the ALJ, Drs. Loomis and Patterson's opinions were consistent with and supported by the Kern County Mental Health records between 2008 and 2010.